GADDIE v. MANN et al.

(Circuit Court, S. D. Georgia, W. D.    September 7, 1906.)

1. PARTNERSHIP—MUTUAL RIGHTS AND DUTIES OF PARTNERS—ACQUIRING TITLE ADVERSE TO FIRM.

Complainant and defendants entered into a written memorandum contract, which recited that they were "offering for sale a tract of land * * * (about 17,000 acres)," and providing that, in case of sale, they should share equally in the net profits. The evidence showed that the land was timber land, and that it was the intention to acquire it by purchase from separate owners of small tracts; the expected profit being in aggregating such tracts and selling together to some large lumbering concern. A number of options had previously been secured, and others were subsequently secured, aggregating in all some 25,000 acres. Some of these options expired, and one of the defendants renewed the same in his own name, as he was authorized to do for convenience. Nothing had been done toward terminating the agreement, and all parties were performing the agreed services in furtherance of the scheme, when such defendant contracted to sell all of the land for his own benefit, claiming that the agreement expired with the options which were held when it was made. *Held*, that the agreement created a partnership; that such defendant could not renew the expiring options for his own benefit, but such renewals inured to the benefit of all the partners, and all were entitled to share in the profits of the sale.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Partnership, § 144.]

2. SAME—SUIT FOR DISSOLUTION—FRAUDULENT CONDUCT OF PARTNER.

Where one partner has contracted to sell the partnership property, standing in his name, and refuses to admit his partners' interest in the property or proceeds, equity has jurisdiction of a suit by one of the other partners for a dissolution and an accounting, and in such case, where fraud is charged against such defendant, the court will not permit him to retain control and the right to dispose of the property by giving a bond, but will enjoin his further action in respect thereto and take possession by its receiver until the rights of the parties are determined.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Partnership, §§ 620, 760.]

3. COURTS—JURISDICTION OF FEDERAL COURT—SUIT FOR DISSOLUTION OF PARTNERSHIP.

Where one partner has committed acts which render the continuation of the partnership impossible, all of the other partners are not required to join as complainants in a suit for dissolution; but such suit may be maintained by one, joining the others as defendants, and the facts that the interest of others may be similar to his own, and that they are citizens of the same state as the offending partner, will not defeat the jurisdiction of a federal court, where the complainant is a citizen of another state.

[Ed. Note.—For cases in point, see vol. 13, Cent. Dig. Courts, § 855.

Diverse citizenship as ground of federal jurisdiction, see notes to Shipp v. Williams, 10 C. C. A. 249; Mason v. Dullagham, 27 C. C. A. 298.]

In Equity. Suit for dissolution of partnership. On motion to give bond.

Olin J. Wimberly, for complainant.
A. L. Miller, for defendant Mann.

SPEER, District Judge. This is a bill brought for the dissolution and distribution of the assets of a partnership. The complainant,

for the purposes of this decision, must be regarded as a citizen of North Carolina. The respondents who appear at this stage of the case are citizens of Georgia and residents of this district. The statutory jurisdictional amount is involved.

The following is the contract of partnership before the court:

"Georgia, Telfair County:

"This agreement made and entered into this the 29th day of Nov. 1904, by and between Frank Mann, Thos. J. Wooten, W. M. Gaddie, and C. M. Wise, whereby the said parties are offering for sale a tract of land on the Ocmulgee river, (about 17,000 acres) and the said C. M. Wise is to have the sale of said property, and in case of a sale, then all parties hereto to share equally in the net profits of said sale.

"[Signed]
             F. R. Mann.
             "Thos. J. Wooten.
             "W. M. Gaddie.
             "C. M. Wise.

"Witness: A. J. Walker, J. P."

The plaintiff, W. M. Gaddie, is an expert in the valuation of standing timber. He has devoted 36 years of his life to this business, and for the last 10 years has been engaged in estimating and purchasing large bodies of timber lands lying in the state of Georgia. The evidence establishes that he is an expert with regard to the value of pine timber and hard woods also. J. J. Dorminy, owner of two of the largest sawmills in southern Georgia, testified that he had frequent transactions with Gaddie; that the latter had purchased and sold for him thousands of acres of timber, is a timber man of experience and ability, and understands everything connected with the timber business. The Messrs. Garbutt, proprietors of the Garbutt Lumber Company, and Mr. T. S. Price, prominently engaged in the same business, testify to the same effect.

It appears from the record that Frank R. Mann, Thomas J. Wooten, C. M. Wise, and W. M. Gaddie, the complainant, entered into the agreement above set forth. The proof shows that they agreed to secure certain options for the purchase of large bodies of valuable hard-wood timber. This was found principally in the broad swamp lands of the Ocmulgee river in the counties of Coffee and Telfair. It consisted of white oak, red oak, cypress, white hickory, pig-nut hickory, maple, elm, ash, poplar, swamp pine, water oak, red gum, black gum, tupelo, beech, birch, sycamore, persimmon, and cottonwood. While in the main contiguous, the lands upon which this timber stood belonged to a number of different parties, and it was recognized by the parties to the agreement that the aggregation of such isolated tracts of timber, now finding a ready sale, would prove a profitable investment. This was principally ascribable to its availability for milling. It was near Lumber City, on the river, and near the railroad. Some of the testimony was to the effect that freight rates at this point were one-half less than those exacted for similar shipments of timber not so favorably situated. The parties were satisfied that they would be recompensed for their expense, time, experience, and skill by the difference between the market value of such an aggregated tract, and separate small tracts, which were theretofore regarded as of little value. Indeed, it was conceded on the argument by counsel for the respondent that

147 F.—61

large profits might be had from this scheme. These were estimated to be from $50,000 to $100,000. He denied, however, that the complainant was entitled to any share therein.

It further appears from the proof that each of the copartners was to endeavor to make a sale, although Wise had special charge of the duty of advertising and of making direct efforts to secure a purchaser. The complainant himself was to exert for the benefit of the partnership the skill and judgment he had acquired by his long experience as a timber man. There is no dispute at all as to these facts. It was the special duty of Mann to secure the options. The agreement seemed mutually beneficial, and it was signed. The parties went to work in pursuance of the general plan and secured control of between 17,000 and 25,000 acres of hard-wood lands of great value. This was done by means of options and escrow deeds. So clear is the participation of the four parties in the general plan that it was admitted by the defendant's counsel that until October 1, 1905, when he insists that the contract terminated, all four of the men went forward in the utmost good faith and attempted to carry out the scheme. Gaddie himself testified that he devoted practically his entire time to the labors belonging to him under this partnership; that he was instrumental in obtaining many of the options, and the testimony is uncontradicted that he was of great assistance in the information he furnished to Wise with regard to the lands. This was to be used for advertisements which were published generally throughout the country, and it cannot be fairly denied that his services were largely instrumental in bringing about the prospective sale, to which reference will presently be made. Nor was such assistance on his part restricted to Wise. He furnished information to prospective purchasers who came to look at the land. To Mann himself he gave much information relative to lumber business of this character. Mann was a turpentine operator, and apparently not skilled in the estimation or appraisement of value in hardwood timber. Through Gaddie's assistance, he was thus enabled to secure advantageous options and to judiciously handle the lands thus controlled for the purposes of the partnership. The entire correspondence between the parties is put in evidence, and it nowhere appears that Mann or any of the other partners made the slightest complaint in writing or otherwise, as to the manner in which Gaddie performed his duties. It is plain enough that he at all times did what was required of him. It is, however, now contended as one of the grounds of defense that he lacked the requisite expert knowledge. The court regards this contention as wholly disproved. Were it true, however, it would not for that reason justify Mann, a partner, in taking action which would result in an immediate and arbitrary dissolution of the partnership and the acquisition to his own benefit of all the values which had been accumulated. Nor is the principal contention, which it appears Mann deemed to justify him in taking such action, more meritorious than the attack upon Gaddie. It is insisted that the contract to handle these timber lands had in view only the existing leases and escrow deeds, and that the contract itself as a consequence terminated on the date whereon the last option might expire, to wit, October

1, 1905. Mann contends that after that date it was competent for him to get for himself any advantage he could out of the situation as it then stood. Pretermitting consideration at this time of the fact, as it seems, that Mann was himself largely instrumental in delaying and defeating the completion of the purchase under the options, and regarding him merely as a partner who had previously taken no action and sought no advantage for himself, it is not tolerable in a court of equity that he shall be permitted to shut out the complainant or others concerned from the resulting profits of their agreement and labors, and seize the occasion to acquire such profits for himself. That he attempted to do this is indisputable. This is true, notwithstanding the fact that the partnership was of full force and effect, no step whatever had been taken to terminate it, and the partners yet held many leases and options which had not expired. As the options expired Mann sedulously renewed them all in his own name. This gave no information to his partners of the design he had, for, because of his acquaintance in the neighborhood, he had for the purposes of the partnership been authorized to take these conveyances in his own name. When, however, on April 27, 1906, he made a written contract, which is in evidence, for the sale, on his own account of all these lands, the complainant not unnaturally felt himself aggrieved and brought this bill to obtain the relief sought.

Nor is the inequitable character of Mann's conduct to be avoided by his present contention that a large number even of the renewed options have also expired. The court will not hear him to make this contention for his private advantage to the injury of the complainant. Besides, in his own contract with Trigg and White, he recites that he "is the owner in fee simple of about 15,000 acres of lands and timber situated in the counties of Telfair and Coffee, state of Georgia, on the waters of the Ocmulgee river, and also contracts controlling timber land adjoining said property, making the land owned and controlled by [him] to contain about 25,000 acres." These are the lands concerning which this suit is brought. To permit him now to proceed thus to sell the partnership assets, without accounting to the complainant and his other partners for their share of the profits of this transaction, would seem wholly unconscionable.

That he was a partner with the others cannot be fairly questioned. The law upon this subject is not contested. "Where two or more parties are engaged in a joint business enterprise, in which they contribute either capital, skill, or labor, upon an understanding, tacit or otherwise, that they will share in common the profits accruing therefrom, they are partners in fact and in law." In re Beckwith & Co. (D. C.) 130 Fed. 476, citing George on Partnership, 30. The written memorandum signed by the parties is conclusive as to the nature of their agreement and of their equal share in the profits. Taken in connection with the proof showing the duties to be performed, there is no satisfactory evidence that the partnership would be terminated ipso facto because purchases under certain options might not be completed on or before the date therein specified. In

the very nature of a transaction of this sort that would seem untenable. Indeed, many thousands of acres were acquired under the partnership subsequent to the signing of the agreement. Besides, the plainly expressed purpose of the arrangement is the handling and sale of "a tract" of land on the Ocmulgee river, and the partners might well fail to obtain control of integral parts of that tract, and yet the remainder, or any equities the parties might have, would be regarded as assets of the partnership. Mann in effect admits his intention to exclude his copartners from participation in the profits of their agreement, whatever such profits might be, and, in the affidavit filed in support of his defense, he admits that they are to be excluded from all participation in the profits of the sale to Trigg and White. Nothing in view of the relation could be more indefensible.

Partners are not to be permitted to take the law in their own hands in such manner and with such results to copartners. In Mitchell v. Reid (N. Y.) 19 Am. Rep. 252, the court observes:

> "The relation of partners with each other is one of trust and confidence. Each is the general agent of the firm, and is bound to act in entire good faith to the other. The functions, rights, and duties of partners in a great measure comprehend those both of trustees and agents, and the general rules of law applicable to such characters are applicable to them. Neither partner can, in the business affairs of the firm, clandestinely stipulate for a private advantage to himself. * * * Every advantage which he can obtain in the business of the firm must inure to the benefit of the firm. These principles are elementary."

In that case the contract expressly stipulated that the partnership would terminate at the date of the expiration of the lease of the Hoffman House in New York, the management of which was the purpose of the partnership agreement. Before its expiration, the defendant, without the knowledge of his copartners, procured a renewal of this lease for a term commencing on the date that the partnership was to terminate and the original lease was to expire. The court held that this new lease inured to the benefit of the firm; the partner being a trustee thereof for the partnership. See, also, Struthers v. Pearce, 51 N. Y. 357, with regard to a contract of uncertain duration. There the same principle is laid down that a new lease accrued to the partnership assets. The famous case of Keech v. Sandford, 1 Lead. Cas. in Eq. (Hare & Wallace's Notes) 84, established the doctrine that a renewal of a lease "is but a graft on the old stock." This has been affirmed by a long line of cases. Featherstonhaugh v. Fenwick, 17 Ves. 298; Phyfe v. Wardell, 3 N. Y. Ch. R. Ann. 714; Gibbes v. Jenkins, 7 N. Y. Ch. R. Ann. 798.

Nor is the jurisdiction in equity questionable. The bill prays the dissolution of the partnership with other ancillary relief. Now the basis of such a bill "is the necessity for the due winding up of a partnership; and this equity alone, independently of any other considerations, will entitle a suitor to demand relief at the hand of a chancellor." Bispham's Eq. (6th Ed.) 635. "The general ground for a dissolution is that the partnership cannot be carried on for the benefit of the parties, according to the original intention." Id. 636.

In view of the refusal of the defendant Mann to permit his co-partners to share equally in the benefits of the Trigg and White contract, of his claim that the renewals of the original options and deeds accrue solely to his individual advantage, and of his manifest intention disclosed by the record to exclude his copartners from the partnership undertaking, this is clearly a case which justifies the decree for a dissolution and accounting. And, "where a dissolution has been decreed in consequence of the improper conduct of parties, or for some similar cause, a receiver will be appointed as a matter of course; the reason being that the same causes which justify a decree for dissolution in such cases will also justify an appointment of a receiver." Bispham's Eq. 638.

The present case, under the facts, also is fairly within the principle expressed by Mr. Pomeroy (5 Pomeroy's Eq. 145), as follows:

"The exclusion of one partner from his full share of participation in the business of the partnership is considered one of the strongest grounds for the appointment of a receiver. When the application is made on this ground, it is not always a necessary condition of the action of the court that the property should be in imminent peril; but, if there is in addition to the exclusion a showing of fraudulent conduct on the defendant's part, and a dissolution is inevitable, the court will unhesitatingly appoint a receiver."

The respondent has resorted to another expedient by which he seeks to continue in control of the assets of the partnership, which, as is seen, he has taken charge of in his own interest. This is a motion to tender what he terms an "eventual condemnation money bond" to secure the complainant in any recovery he might make. This motion is obviously addressed to the discretion of the court, and, under the circumstances of the case, must as obviously be denied. The effect of the motion, if granted, would be to leave the management of the entire transaction in the hands of one who seems to be, in the present state of the case, a wrongdoer, and who would therefore, with the advantage of possession, render increasingly difficult the efforts of the court to ascertain what are the real values involved and the profits which should be shared. Here grave fraud is charged, here an investigation is imperatively demanded. The court cannot leave the control of the situation in the hands of Mr. Mann; it must enjoin his activities, and place the values—which are apparently great—in the control of impartial hands. As stated in High on Injunctions (volume 2, pp. 1502-1504):

The court will continue the injunction "where fraud is the gravamen of the bill, or where it is apparent to the court that a dissolution of the injunction would result in greater injury and hardship than its continuance to the hearing, or where it is apparent that by the dissolution complainant would lose all the benefit which would otherwise accrue to him should he finally succeed in his cause." And "where the case as presented by the bill is one which seems to require investigation, and the effect of dissolving the injunction would be to place the property which is the subject of controversy beyond the control of the court in which the action is pending, and would be equivalent to a complete denial of the relief sought by the bill, the injunction will not be dissolved."

Besides, the Supreme Court of the United States, in Shields v. Coleman, 157 U. S. 178, 15 Sup. Ct. 570, 39 L. Ed. 660, has declared

that, when a court of the United States, after the appointment of a receiver, "accepted a bond in lieu of the property, discharged the receiver, and ordered him to turn over the property to the railroad, and such surrender was made in obedience to this order, the property then became free for the action of any other court of competent jurisdiction. It will never do to hold that after a court, accepting security in lieu of the property, has vacated the order which it has once made appointing a receiver and turned the property back to the original owner, the mere continuance of the suit operates to prevent any other court from touching that property. * * * The property ceased to be in custodia legis. It was subject to any rightful disposition by the owner or to seizure under process of any court of competent jurisdiction." See, also, Alderson on Receivers, 26. Since Mr. Gaddie has sought this forum, his rights, such as they may be found to be, will be here determined. On this general subject, see Bennett v. Smith, 108 Ga. 466, 34 S. E. 156; Mead v. Burk (Ind. Sup.) 60 N. E. 338.

It is, however, said that the court has no jurisdiction, for the reason that one of the copartners, whose interests are similar to those of the plaintiff, and who concedes the rights of the plaintiff—which are to a degree coincident with his own—is a citizen of Georgia and ought to be treated as a plaintiff, with a view of defeating jurisdiction. This contention in this case is not regarded as sound. The plaintiff has the right to choose his forum. Conceding that the resident partner might, had he chosen, have been a party plaintiff, he was not a necessary party as such, and the court will not sua sponte institute a suit in his behalf and in his name in order to defeat jurisdiction. See Insurance Co. of North America v. Delaware Mut. Ins. Co. (C. C.) 50 Fed. 250.

To deny the complainant relief here, because one of the partners whose interests may coincide with his is a citizen of Georgia, would, indeed, nullify one of the main purposes for invoking the equity jurisdiction of United States courts in bills of this character. When one or more partners commit acts which render the continuation of the partnership impossible, but which in different degrees injure their copartners, it would be manifestly absurd to require all of the latter to join as co-complainants in order to obtain a decree of dissolution. The interests of Gaddie and of Wise cannot be regarded as identical, nor can it be maintained that the latter is the real complainant. In this case, as seen, the partnership was created by writing severally signed by four partners, each of whom had distinct duties to perform, and each of whom was to have a separate share of equal value in the profits of the venture. In such cases the cause of action cannot be regarded as necessarily joint, else it would leave a suitor without remedy whenever his copartners, through indifference, conspiracy, or fraud, fail or refuse to join with him in a proceeding against the offender or offenders. By a parity of reasoning it would be equally competent for resident partners to conspire and insist upon bringing a bill for dissolution in a state court, and thus deprive a nonresident of his constitutional right to sue in the courts of the nation. The bill is in behalf of Gaddie. It

prays a dissolution and accounting, with the ancillary remedies of injunction and receivership. The decree will bind each of the partners and will determine their separate rights. Under this view, we think it clear that the right of the complaining citizen of another state must be heard and determined here.

The injunction will be maintained, the receivership made permanent and suitable order will be framed, if practicable, authorizing the receiver to carry out the purposes for which the partnership was formed. The details may be provided by the interlocutory decree.